UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____x

OUSSAMA EL OMARI,

                  Plaintiff,                          Case No.:  19-cv-1457  (   )(   )

     v.

                                             **COMPLAINT**

THE INTERNATIONAL CRIMINAL
POLICE ORGANIZATION - INTERPOL,

                Defendant.
_____x

       OUSSAMA EL OMARI, Plaintiff in the above referenced action, by and through

counsel, MOORE INTERNATIONAL LAW PLLC, as and for his Complaint, states as follows:

## <u>INTRODUCTION</u>

       1)     This is a suit brought by Plaintiff, Oussama El Omari, a U.S. citizen and resident

of North Carolina, for negligent infliction of emotional distress and for violations of his due

process of law rights under the Due Process Clause of the Constitution of the State of New York,

against the Defendant, The International Criminal Police Organization – INTERPOL, a non-

governmental non-profit corporation, organized under the laws of France, with its principal place

of business and headquarters located in Lyon, France. This suit arose out of Defendant's issuance

and refusal to delete a "Red Notice" calling for the arrest of Plaintiff and for his delivery to the

United Arab Emirates, based on bogus and politically motivated criminal judgment data

submitted by the United Arab Emirates, a country without due process of law or an independent

judiciary, and Plaintiff's detention on July 31, 2016 at John F. Kennedy Airport in New York.

## THE PARTIES

2)      Plaintiff, Oussama El Omari, is a U.S. citizen with residence and domicile at 2005 Riviera Ct., Raleigh, North Carolina.

3)      Defendant, The International Criminal Police Organization - INTERPOL, is a non-governmental non-profit corporation organized under the laws of France, with its principal place of business, headquarters, and domicile located at 200, quai Charles de Gaulle, 69006 Lyon, France.

## JURISDICTION AND VENUE

4)      This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

5)      This court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6)      Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, as alternative relief.

7)      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

### INTERPOL Background

8)      The Defendant, International Criminal Police Organization - INTERPOL, ("Defendant" or "INTERPOL"), is an organization which has morphed into its present form from its beginning in 1914 as the International Criminal Police Congress in Monaco. Officially created in 1923 in Vienna, Austria, as the International Criminal Police Commission, the organization was under control of Nazi Germany from 1938 to 1945, when it relocated to Berlin. Past presidents of the organization included Reinhard Heydrich (1940-42) who was one of four Nazi presidents of the organization. Heydrich was the third highest ranking Nazi under Adolf Hitler, and was in charge of the Nazi genocide policy of the "complete solution of the Jewish Question."

2

9)      The organization later became known in its present form as INTERPOL in 1956

when it was organized as a non-governmental non-profit corporation under the laws of France,

operating by the collection of dues from governments of member countries, and is presently

located in Lyon, France. INTERPOL was not created by treaty or international agreement. The

Defendant does not have a Board of Directors or any independent oversight body. The Defendant

is self-managed by its membership, which includes an Executive Committee 100% composed of

police officials. The Defendant maintains an office in the County of New York.

10)      INTERPOL began using a color-coded notice system about 1948 when the first

"Red Notice" for persons wanted internationally was issued.

11)      Today, Red Notices are posted on INTERPOL's publicly accessible website, and

are electronically disseminated via computer to and within member countries, including at

airports in New York and across the United States.

12)      On November 3, 1982, INTERPOL was party to an Agreement between the

International Criminal Police Organization-INTERPOL and the Government of the French

Republic regarding INTERPOL's headquarters in France and its privileges and immunities on

French territory. ("the 1982 Agreement") The accompanying Exchange of Letters between

INTERPOL and France establishing the 1982 Agreement, required INTERPOL to establish a

Supervisory Board. Article 24 contained a dispute resolution clause providing for arbitration of

disputes between INTERPOL and private parties, and between INTERPOL and France.

13)      On April 14, 2008, INTERPOL and France entered into a new agreement which

abrogated and replaced the 1982 Agreement. ("the 2008 Agreement"). The 2008 Agreement

abrogated the obligation of INTERPOL to establish a Supervisory Board. To the present day,

INTERPOL does not have any external supervisory board. Article 24 of the 2008 Agreement

provided an arbitration clause for dispute resolution. Article 24(1) provided for the right of arbitration for disputes between INTERPOL and private parties, which provides:

> Unless the Parties in the dispute decide otherwise, any dispute between the Organization and a private party shall be settled in accordance with the Optional Rules for Arbitration between International Organizations and Private Parties of the Permanent Court of Arbitration by a tribunal composed either of one or of three members appointed by the Secretary General of the Permanent Court of Arbitration. Either party may however request the Secretary General of the Permanent Court of Arbitration to establish such a tribunal immediately to examine a request for provisional measures to ensure that its rights are protected.

14)     On March 17, 2016, INTERPOL and France abrogated the Article 24(1) right for private parties to externally arbitrate Red Notice and other disputes, replacing it with a requirement for private parties to resolve disputes internally within INTERPOL ("the Commission for the Control of INTERPOL's Files" referred to in the additional protocol  is internal to INTERPOL), leaving private parties in the United States without an external, neutral, and independent tribunal for dispute resolution and relief. Said abrogation came about by an additional protocol in the form of an "Exchange of letters between the Government of the French Republic and the International Criminal Police Organization – INTERPOL on the interpretation and application of Article 24 of the Agreement of 14 and 24 April 2008 regarding INTERPOL's headquarters in France," signed in Paris on 9 February 2016, and in Lyon on 12 February 2016. ("the 2016 Agreement"). The additional protocol provides,

> The Government considers, as does the International Criminal Police Organization, that *the arbitration channel provided for in paragraph 1 of Article 24 of the abovementioned Agreement does not apply either to disputes regarding the processing of data in INTERPOL's Information System – such as INTERPOL notices, diffusions or messages* – which may be brought before the Commission for the Control of INTERPOL's Files, or to disputes regarding the employment conditions of INTERPOL's officials, which may be brought before the Administrative Tribunal of the International Labour Organization. [emphasis added]

15)     As such, pursuant to INTERPOL's agreements with its host country, France, INTERPOL was released from its obligation to establish an external Supervisory Board in 2008, and was released from its obligation to arbitrate disputes with private parties in March of 2016.

**INTERPOL and the United States**

16)     In 1938, when INTERPOL was controlled by Nazi Germany and located in Berlin, the U.S. Congress authorized the Attorney General to participate in INTERPOL and pay dues out of its budget, without requiring Presidential action, and referred to INTERPOL as "that organization." 22 U.S.C. § 263a provides:

> The Attorney General is authorized to accept and maintain, on behalf of the United States, membership in the International Criminal Police Organization, and to designate any departments and agencies which may participate in the United States representation with that organization. All dues and expenses to be paid for the membership of the United States shall be paid out of sums authorized and appropriated for the Department of Justice.

17)     In 1945, the International Organizations Immunity Act, ("the Act" or "IOIA"), was passed by the First Session of the Seventy-Ninth Congress. 22 U.S.C. § 288, *et seq*. The Act grants certain privileges and immunities to qualified international organizations. §§ 288a-f. Congress has periodically amended the Act to specifically extend the Act to certain entities. See, §§ 288f1-7, g-l. For example, in 1992, Congress specifically extended the Act to the International Development Law Institute. § 288j. Congress has not specifically extended the Act to INTERPOL.

18)     Immunity from legal process is provided under § 288a:

> *International organizations* shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:
>
> > (a) International organizations shall, to the extent consistent with the instrument creating them, possess the capacity—

> (i) to contract;
> (ii) to acquire and dispose of real and personal property;
> (iii) to institute legal proceedings.

> (b) International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, *except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract*. [emphasis added]

19)     INTERPOL is not a "public international organization" as defined by 22 U.S.C. § 288, which is the threshold requirement of the IOIA:

> For the purposes of this subchapter, the term "international organization" means a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation, and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in this subchapter.

20)     There are three required elements in § 288. 1) "a public international organization," 2) "in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation," 3) "and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in this subchapter."

21)     The Act also grants certain revocation powers to the Department of State. § 288f, provides, in pertinent part,

> Provided, That nothing contained in this subchapter shall be construed as precluding the Secretary of State from withdrawing the privileges, exemptions, and immunities provided in this subchapter from persons who are nationals of any foreign country on the ground that such country is failing to accord corresponding privileges, exemptions, and immunities to citizens of the United States.

22)     In 1946, by Executive Order 9698 of February 19, 1946, President Harry Truman designated the U.S. Department of State with the authority to receive and process applications by proposed international organizations and make recommendations to the President. 11 FR 1809. EO 9698 provides:

> By virtue of the authority vested in me by section 1 of the International Organizations Immunities Act, approved December 29, 1945 (Public Law 291, 79th Congress), and having found that the United States participates in the following-named international organizations pursuant to a treaty or under the authority of an act of Congress authorizing such participation or making an appropriation therefore, I hereby designate such organizations as public international organizations entitled to enjoy the privileges, exemptions, and immunities conferred by the said International Organizations Immunities Act:
>
> The Food and Agriculture Organization.
> The International Labor Organization.
> The United Nations.
>
> With respect to the designation of such other international organizations as may be entitled to the privileges, exemptions, and immunities conferred by the said Act, the Department of State is hereby designated as the agency to receive applications for the granting of such privileges, exemptions, and immunities. The Secretary of State shall require such information as he may deem necessary from the international organizations making such applications, and shall submit recommendations to the President as to whether the applicant organizations should be designated as public international organizations entitled to enjoy the privileges, exemptions, and immunities conferred by the said Act.

23)     From 1950 to 1958, the United States, through the U.S. Department of Justice, withdrew from INTERPOL due to the use of INTERPOL by a Communist member country to track down political refugees fleeing Eastern Europe. The U.S. Treasury Department maintained informal contact with INTERPOL during this period.

24)     In 1983, INTERPOL circumvented President Truman's EO 9698 by not applying to and obtaining from the Department of State a recommendation that it was eligible for IOIA designation. Instead, INTERPOL went around State and directly to the United States National Central Bureau, a part of the Department of Justice. Memorandum Opinion for the Chief, Interpol National Central Bureau, January 12, 1983, by Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel.

25)     Six months later, by Executive Order 12425 of June 16, 1983, INTERPOL was designated by President Ronald Reagan, with limited immunity under the IOIA. 48 FR 28069.

26)     By Executive Order 13524 on December 17, 2009, President Barack Obama amended President Reagan's EO 12425 by removing certain immunity limitations. 74 FR 67803.

27)     However, the President does not have the Constitutional authority to grant INTERPOL privileges and immunities under the Act that Congress did not intend as a public international organization and has not authorized. Further, a blanket grant of authority to the President to grant privileges and immunity under the Act to a public international organization as defined by the President, would be an unconstitutional delegation of power.

28)     Even assuming, *arguendo*, that INTERPOL is a public international organization as defined by the IOIA, which it is not, INTERPOL waived its immunity under § 288a(b) for purposes of disputes with private parties in the U.S. by virtue of its 1983 and 2009 Agreements with France.

29)     The IOIA provides an immunity exception, that "*except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.*" § 288a(b)

30)     At the time of President Reagan's EO 12425 of June 16, 1983, and at the time of

President Obama's EO 13524 on December 17, 2009, INTERPOL was contract bound by Article

24(1) of its agreements with France to arbitrate disputes with private parties. Therefore, under

the language of § 288a(b), INTERPOL waived its immunity for purposes of dispute resolution

with U.S. private parties on the dates of both EOs.

31)     INTERPOL requires member countries to organize and operate a "national central

bureau" or "NCB." In the United States its NCB is a component of the U.S. Department of

Justice, known as the United States National Central Bureau – INTERPOL ("USNCB"), also

known as "INTERPOL – Washington."

32)     The USNCB is co-managed by the USDOJ and the U.S. Department of Homeland

Security under a Memorandum of Understanding between the USDOJ and USDHS, dated July

10, 2010.

33)     To govern operations involving the United States, INTERPOL and the USDOJ

entered into a contract under date of January 14, 2005, ("the INTERPOL-USNCB contract").

The first and second paragraph of Part III of the INTERPOL-USNCB contract provides, in

pertinent part:

> Interpol will consult with, and advise the USNCB of any initiatives or
> projects which it contemplates entering into with entities located in the
> United States.
>
> Prior to entering into any agreement or arrangement with United States'
> entities, Interpol shall ensure that the USNCB has reviewed the proposed
> arrangement and has approved it in principle.

34)     The language of the INTERPOL-USNCB contract requires USDOJ supervision of

INTERPOL's activities in the United States for fundraising and other activities. As described

below, since 2013, supervision of INTERPOL by the USNCB has been circumvented by

INTERPOL's creation of its fundraiser, the INTERPOL FOUNDATION.

**<u>INTERPOL and the United Arab Emirates</u>**

35)     The United Arab Emirates, ("UAE"), is also a member of INTERPOL. In the

UAE, its NCB is called the UAE National Central Bureau, or UAENCB, located in Abu Dhabi.

36)     There are presently about 194 country members of INTERPOL. In 2017,

"statutory" or mandatory dues by member countries totaled approximately 54 million euros, with

the United States contributing approximately10 million euros, and the UAE contributing

approximately 231,000 euros.

37)     The UAE is a Middle Eastern country at the southeast end of the Arabian

Peninsula on the Persian Gulf, bordering Oman to the East and Saudi Arabia to the South, as

well as sharing maritime borders with Qatar to the West and Iran to the north. The government of

the UAE is a federation of absolute monarchies, without any democratic process, with its capital

located in Abu Dhabi. The population of the UAE is approximately 9.7 million, with only

approximately 12% of the total composed of UAE citizens, and the balance composed of

workforce immigrants. Political parties are banned.

38)     There is ample public information available to INTERPOL issued by credible

international sources about the lack of judicial independence and human rights concerns about

the UAE, and the resulting high risk of illegitimate criminal court judgments. It is common

knowledge in INTERPOL that UAE rulers control the courts, and that the UAE has a history of

abusing INTERPOL Red Notices against political opponents and to gain leverage in ordinary

civil disputes. INTERPOL has a history of deleting UAE requested Red Notices when

challenged by private parties.

39)      According to the 2017 *UAE Human Rights Report* by the U.S. Department of State, at page one, "The most significant human rights issues included allegations of torture in detention; arbitrary arrest and detention, including incommunicado detention; government interference with privacy rights; limitations on the freedoms of speech and press, including criminalization of libel and arrests and detentions for internet postings or commentary; restrictions on assembly and association; the inability of citizens to choose their government in free and fair elections; and criminalization of same sex sexual activity, although no cases were publicly reported during the year. The government did not permit workers to join independent unions and did not effectively prevent physical and sexual abuse of foreign domestic servants and other migrant workers." Further, at page eight, "The constitution provides for an independent judiciary; however, court decisions remained subject to review by the political leadership. Authorities often treated noncitizens differently from citizens. The judiciary consisted largely of contracted foreign nationals subject to potential deportation, further compromising its independence from the government."

40)      According to the 2017 *Report of the Special Rapporteur on the independence of judges and lawyers*, by the United Nations High Commissioner for Human Rights, at page eight, "The Special Rapporteur regrets that the principle of the separation of powers is not explicitly guaranteed in the Constitution."  Further, a page nine, "While any direct interference in the work of judges or threat against their independence is extremely difficult to document, reports and allegations of pressure exerted by members of the executive, prosecutors and other State agents, in particular members of the State security apparatus, are of serious concern to the Special Rapporteur. She is especially concerned that the judicial system remains under the de facto control of the executive branch of government."

41)      According to the 2017-2018 *UAE Report*, at page one, by Amnesty International, "The authorities continued to arbitrarily restrict freedoms of expression and association, using criminal defamation and anti-terrorism laws to detain, prosecute, convict and imprison government critics and a prominent human rights defender. Scores of people, including prisoners of conscience, who were sentenced following unfair trials remained in prison. Authorities held detainees in conditions that could amount to torture and failed to investigate allegations of torture made in previous years. Women continued to face discrimination in law and in practice. Migrant workers remained vulnerable to exploitation and abuse. Courts continued to hand down death sentences; there was one execution."

42)      In 2013, INTERPOL created the so-called "INTERPOL Foundation for a Safer World," ("INTERPOL FOUNDATION"), organized by INTERPOL as a non-profit corporation under the laws of Switzerland, with its principal place of business and headquarters located in Geneva, Switzerland. The INTERPOL FOUNDATION's financial reports are not disclosed or accessible from the website of either INTERPOL (Interpol.int) or INTERPOL FOUNDATION (interpolfoundation.org). INTERPOL's interactive website, which is accessible from New York, describes it began changing its "Funding Model" in 2012 and was implemented in 2015, which permits donations from public and private sources to the INTERPOL FOUNDATION. The INTERPOL website states that the INTERPOL FOUNDATION supports INTERPOL, and describes it as legally and administratively separate. However, the INTERPOL FOUNDATION is a *de facto* fundraising vehicle for INTERPOL.

43)      In 2016, the INTERPOL FOUNDATION and the UAE signed an agreement and announced the intention to build the INTERPOL FOUNDATION's "World Bureau" in Abu

Dhabi, which would effectively move the INTERPOL FOUNDATION's headquarters to Abu Dhabi.

44)    The following year, in 2017, the UAE and the INTERPOL FOUNDATION announced the UAE pledged 50 million euros to the INTERPOL FOUNDATION over 5 years. Also in 2017, the UAE hosted the meeting "Unity for Security – Abu Dhabi – 2017" sponsored by INTERPOL, the INTERPOL FOUNDATION, and the UAE. At this meeting, the board of directors of the INTERPOL FOUNDATION named its board member, Hamad Saeed Al Shamsi, of the UAE Ministry of Foreign Affairs, as the INTERPOL FOUNDATION's first "Ambassador."

45)    During the same time period, the INTERPOL FOUNDATION pledged to contribute 50 million euros to INTERPOL, being the same amount pledged by the UAE to the INTERPOL FOUNDATION. In 2017, the UAE's yearly pledged money to the INTERPOL FOUNDATION, in turn pledged to INTERPOL, is equal to approximately 20% of INTERPOL's total yearly statutory member dues, roughly equaling the United States' contribution of about 10 million euros, and far surpassing the UAE's statutory contribution of about 231,000 euros.

**INTERPOL and Plaintiff**

46)    On July 31, 2016, Plaintiff, Oussama El Omari, ("Plaintiff" or "El Omari" ), landed by commercial flight at JFK Airport in New York City, New York. JFK airport is a public airport located on property owned by the State of New York and located in the Borough of Queens, and is leased to the Port Authority of New York and New Jersey. Said Port Authority is a joint venture between the states of New York and New Jersey, and in New York is a Class D public benefit corporation receiving state and federal funding. JFK Airport is patrolled and attended to by federal, New York state, and New York City law enforcement officers.

47)    As Plaintiff passed through U.S. Customs, the Customs' questions turned to the UAE. The U.S. Customs and Department of Homeland Security officers are collectively referred to as "Customs officers." Customs officer No. 1, while looking at a computer screen, stated Plaintiff "must have serious problems with the UAE." Customs officer No. 1 further stated that "you had better be careful and not go to the UAE," "they will arrest you and put you in jail," "by the way, we do not have any exchange treaties with them, but you be careful."

48)    Customs officer No. 1 then detained and took Plaintiff to a separate room involving U.S. Homeland Security. Customs officer No. 2 took Plaintiffs' U.S. passport and entered information into a computer, and looked perplexed at what she saw on the screen, causing Customs officer No. 2 to pause and stare at the screen for a while, not knowing what to do. After a few minutes, Customs officer No. 2 picked up a phone and called someone, and kept repeating information about Plaintiff. Customs officer No. 2 hung up the phone, waited a few minutes, and called again and had a few minutes further conversation. Following this second phone call, Customs officer No. 2 called Plaintiff's name to where he was sitting, stamped Plaintiff's paper, and handed Plaintiff his U.S. passport.

49)    Plaintiff left the room with Customs officer No. 3 who checked Plaintiff's luggage, and Plaintiff left the airport. Plaintiff missed his connecting flight home to North Carolina, and stayed overnight in New York.

50)    Thus alerted to the possibility of an INTERPOL Red Notice, Plaintiff on October 26, 2016 submitted a written request to INTERPOL for information it may have about Plaintiff in their files, in accordance with INTERPOL's published rules.

51)    Under a letter dated November 24, 2016, INTERPOL responded to Plaintiff's inquiry, informing him that INTERPOL's files contained a Red Notice, stating in pertinent part:

14

"Please be informed that the Commission has been authorized by the INTERPOL National Central Bureau (NCB) in Abu Dhabi, United Arab Emirates, to inform you that your client is wanted through INTERPOL's channels and that a Red Notice has been issued at the request of NCB Abu Dhabi (UAE): on the basis of the decision n 2014/1625, handed down by the Criminal Court of Ras Al Khaimah, on 8 february 2015, for the charges of … (Embezzlement and Abuse of Position)".

52)     Prior to Plaintiff's detention by U.S. Customs in New York on July 31, 2016, Plaintiff was unaware of the existence of the Red Notice, or of the charges against him in "the decision n 2014/1625, handed down by the Criminal Court of Ras Al Khaimah, on 8 february 2015" upon which the Red Notice was based. After having been employed in the UAE for many years in the economic free zone industry, Plaintiff had been victimized as a scapegoat in a ruling family political conflict between two brothers, Plaintiff's boss, Sheikh Faisal Bin Saqr Al Qassimi, and a newly installed Ruler of the Emirate of Ras Al Khaimah, Sheikh Saud Bin Saqr Al Qasimi. In a powerplay, Sheikh Saud fired Plaintiff and his co-workers, and fired Sheikh Faisal from his government and business positions of power. Operating like the English monarchy's now abolished Star Chamber, Plaintiff and his legal representatives in the UAE were denied notice of the charges against him and denied access to any evidence or witnesses, and the so-called judgment referred to in the Red Notice was issued in secret and *in absentia*.

53)     Under letter dated December 15, 2016, Plaintiff submitted a written request to INTERPOL to lodge Plaintiff's complaint and request deletion of the Red Notice and all related documents and information in INTERPOL files, for the reason that the issuing UAE criminal court is not an independent judiciary, and does not provide due process protections. Further, INTERPOL's internal "Constitution" prohibits INTERPOL from participating in political

persecutions such as involved in this case. Plaintiff submitted supporting documentation, including a copy of the United Arab Emirates 2012 Human Rights Report by the U.S. Department of State, a copy of the Report of the Special Rapporteur on the independence of judges and lawyers on her mission to the United Arab Emirates, by the U.N. Office of the High Commissioner for Human Rights, and a Declaration by Plaintiff's British Expert Witness Radha Stirling expounding on the history of abuse of INTERPOL Red Notices by the UAE. Plaintiff also requested an opportunity to appear by counsel along with his expert witness. INTERPOL never responded to Plaintiff's appearance request.

54)   Under letter dated July 20, 2017, without answering Plaintiff's request for a hearing, INTERPOL denied Plaintiff's request to delete the Red Notice and invited Plaintiff to contact the UAE for relief. INTERPOL found "On the balance the Commission finds that, even assuming that there may be some political elements surrounding this case, the information provided is clearly not sufficient to establish that these elements were predominant over the ordinary criminal law elements of the case and that the processing of the data concerning the Applicant is contrary to Article 3 of the Constitution." INTERPOL further found "Eventually, in order to respect the spirit of the UDHR [UN's Universal Declaration of Human Rights] while at the same time respecting the role of the Commission, the simple assertion of possible procedural irregularities cannot rise to the level of an Article 2 violation. In this case, the [UAE's] NCB has provided assurances that the Applicant will be granted the possibility to appeal the decision issued against him in absentia, with the assistance of a lawyer of his choice. Thus, the Commission finds that the information provided by the Applicant does not demonstrate the likelihood that a flagrant denial of a fair hearing could take place, and it concludes that the processing of the data concerning the Applicant is compliant with Article 2 of INTERPOL's

Constitution." INTERPOL concluded that it "Decides that the data challenged are compliant

with INTERPOL's rules applicable to the processing of personal data." Adding "NOT

INTENDED FOR PUBLIC DISSEMINATION."

55)     Under letter dated August 17, 2017, Plaintiff submitted a written request to

INTERPOL to revise its decision denying Plaintiff's request to delete the Red Notice, in

accordance with INTERPOL's rules. INTERPOL's rules do not provide for an appeal, only for

revision based on new evidence. Plaintiff submitted that INTERPOL's Decision dated July 20,

2017, disclosed new facts supporting Plaintiff's argument of lack of due process and a politically

motivated criminal judgment in the UAE. Plaintiff pointed out the INTERPOL decision

contained material procedural errors in the Commission's implementation of its new rules, which

became effective March 2017. Plaintiff also pointed out to INTERPOL that the denial decision

was decided by a Requests Chamber, a panel, composed of only 3 of the 5 members required by

the INTERPOL rules, Chairperson Saana Palo, Petr Gorodov, and Isaias Trindade. Further, the

INTERPOL rules require the panel to be composed of "lawyers." However the panel of 3 was

composed  of a majority of 2 active and high ranking police officials, who also have law degrees.

Saana Palo is employed as the head of criminal investigation in Finland. Petr Gorodov is a high

ranking public prosecutor in Russia. And, Isaias Trindade is employed as the Chief

Superintendent of the Criminal Investigative Service in Angola. Plaintiff also pointed out that the

non-published nature of the INTERPOL denial violated INTERPOL's transparency rule.

56)     Under letter dated November 6, 2017, INTERPOL sent Plaintiff a written letter

denying Plaintiff's request to revise its denial to delete the Red Notice.

57)     INTERPOL's dissemination and continued dissemination of the erroneous Red

Notice directly put Plaintiff in serious and extreme fear for his physical safety of his arrest,

return to the UAE, and torture and disappearance in the jails of the UAE. It is only because the United States does not have an extradition treaty with the UAE that Plaintiff was not arrested upon his arrival at JFK Airport and delivered to the UAE. INTERPOL's Red Notice prevents Plaintiff from traveling outside of the United States for this fear of his physical safety. Plaintiff has been deprived of his livelihood as a specialist in economic free zones. Plaintiff also cannot travel to visit his family in his native Morocco.

### COUNT I
### (*Negligent Infliction of Emotional Distress*)

58)     Plaintiff repeats the foregoing paragraphs as if fully and completely restated herein.

59)     INTERPOL did owe a duty of care to Plaintiff because it was reasonably foreseeable to INTERPOL that its conduct of receiving criminal judgment data and information from the government of the UAE having a high risk of illegitimacy, and disseminating such data in INTERPOL's Red Notice to the JFK Airport and elsewhere, calling for the arrest of Plaintiff, would likely deprive Plaintiff of his personal liberty and property, and place Plaintiff in serious and extreme physical danger of being arrested and delivered to the UAE, and there, tortured and to disappear in UAE jails without due process of law.

60)     INTERPOL did fail in its duty of care to Plaintiff, to Wit:

a)     INTERPOL did fail to promulgate and apply rules providing for review of high risk criminal judgment data received from the UAE prior to issuing its Red Notice against Plaintiff.

b)     INTERPOL did issue a Red Notice against Plaintiff based on criminal judgment data received from the UAE government, a government known by INTERPOL to have a high risk of illegitimate criminal judgment data.

      c)      INTERPOL did fail to delete its Red Notice against Plaintiff after Plaintiff brought the illegitimate criminal judgment data to the attention of INTERPOL.

      d)      INTERPOL did fail to promulgate and apply conflict of interest and other rules to prevent UAE donations to INTERPOL's *de facto* fundraising entity, the INTERPOL FOUNDATION, from having UAE influence on INTERPOL's Red Notice procedure relating to Plaintiff.

61)      All being a proximate cause of severe and grievous emotional distress, anguish and damage to Plaintiff.

## <u>COUNT II</u>
### (*Violation of Due Process of Law under the New York State Constitution*)

62)      Plaintiff repeats the foregoing paragraphs as if fully and completely restated herein.

63)      INTERPOL did issue and electronically disseminated a Red Notice to JFK Airport in New York calling for the arrest and delivery of Plaintiff to the UAE, being a call for the deprivation of Plaintiff of his life, liberty and property, and did violate the due process of law rights of Plaintiff under NY Const, art I, § 6, by failing to accord Plaintiff his due process rights before, during, and after issuance of the Red Notice, to Wit:

      a)      Notice.

      b)      An opportunity to be heard.

      c)      A decision made by a neutral decisionmaker.

      d)      Notice of the proposed action and the grounds asserted for it.

      e)      Opportunity to present reasons why the proposed action should not be taken.

      f)      The right to present evidence, including the right to call witnesses.

g)      The right to know opposing evidence.

h)      The right to cross-examine adverse witnesses.

i)      A decision based exclusively on the evidence presented.

j)      Opportunity to be represented by counsel.

k)      Requirement that the tribunal prepares a record of the evidence presented.

l)      Requirement that the tribunal prepares written findings of fact and reasons

for its decision.

64)    All being a proximate cause of severe and grievous emotional distress, anguish

and damage to Plaintiff.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Oussama El Omari, seeks a money judgment in favor of

Plaintiff and against the Defendant, in an amount to be determined by a jury of no less than One

Million Nine Hundred Thousand U.S. Dollars, (US$1,900,000).

**As to Counts I - II,**

A)      Compensatory damages,

B)      Special damages,

C)      Emotional distress,

D)      Punitive damages,

E)      Plus, court costs and attorney fees,

F)      Plus, pre-judgment interest,

G)      Plus, post-judgment interest, and

H)      Any other and further relief the Court may deem appropriate and proper.

**Alternative Relief**

As alternative relief, Plaintiff seeks a declaratory judgment that INTERPOL waived its immunity under 22 U.S.C. § 288a(b) for purposes of Plaintiff seeking relief under Article 24(1) of its 1983 and 2009 Agreements with France in force prior to the abrogation of said right by an Exchange of Letters between INTERPOL and France on March 17, 2016.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  New York, New York
        March 13, 2019

MOORE INTERNATIONAL LAW PLLC.

/s/ Scott M. Moore
By: _____
Scott Michael Moore, Esq.
*Attorneys for Plaintiff, Oussama El Omari*
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
T. (212) 332-3474
F. (212) 332-3475
E. smm@milopc.com
