UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X
OUSSAMA EL OMARI,

                           Plaintiff,                    19CV1457 (SJ) (PK)

  - against -                                    MEMORANDUM
                                                     AND ORDER

THE INTERNATIONAL CRIMINAL
POLICE ORGANIZATION – INTERPOL,

                           Defendant.
------------------------------------------------------------X

**JOHNSON, Senior District Judge:**

Plaintiff Oussamma El Omari ("Plaintiff"), a citizen of the United States and a resident of North Carolina, brings this action against the International Criminal Police Organization ("Interpol" or "Defendant"), an inter-governmental organization headquartered in Lyon, France. Plaintiff claims that Defendant's issuance and refusal to delete a Red Notice against Plaintiff constituted Negligent Infliction of Emotional Distress and violated his due process rights under the New York State Constitution, NY Const. Art. I, § 6. Plaintiff seeks a money judgment against Defendant. In the alternative, Plaintiff seeks a declaratory judgment that Defendant waived its immunity under 22 U.S.C. § 288a(b).

1

Presently before this Court is Defendant Interpol's Motion to Dismiss for Lack of Subject Matter Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), Lack of Personal Jurisdiction, pursuant to Federal Civil Procedure 12(b)(2), Insufficient Service of Process, pursuant to 12(b)(5), and Failure to State a Claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Based on the submissions of the parties and for the reasons stated herein, the Motion is GRANTED and the case DISMISSED.

## FACTUAL BACKGROUND

### I. Interpol

Interpol is an international police organization with 194 member countries. Starner Decl., Ex. A. Its headquarters is in Lyon, France and it is governed by an agreement between France and Interpol—The Agreement Between the International Criminal Police Organization - INTERPOL and the Government of the French Republic Regarding INTERPOL's Headquarters in France ("Headquarters Agreement"). *See id.*, Ex. E. The operative Headquarters Agreement entered into force on September 1, 2009 and was modified by additional protocol on March 17, 2016. *See id.*, Ex. F. The General Secretariat, the body that coordinates Interpol's day-to-day activities, sits in Lyon and is staffed by Interpol employees and police officials from Interpol member countries who are seconded to the organization. *See id.*, Ex. A.

Interpol also maintains a global complex for innovation in Singapore and several satellite offices. *Id.* Every Interpol member country has a National Central Bureau (NCB). *Id.* Each Interpol NCB is run by national police officials and is intended to serve as link between the member country's national police and the global Interpol network. *Id.*

Interpol's primary function is to facilitate transnational policing by providing member countries' police agencies with a communication network. *See* James Sheptycki, *The Accountability of Transnational Policing institutions: The Strange Case of Interpol*, 19 CAN. J.L. & SOC. 107, 116. (2004). To do this, Interpol serves as "a central repository for the collection, transmission, and analysis of information on transnational criminals." Ethan A. Nadelmann, *Role of the United States in the International Enforcement of Criminal Law*, 31(1) Harv. Int'l. L.J. 37, 46 (1990). It also acts as a conduit for international arrest warrants, extradition requests, and requests for criminal evidence. *Id.* It is not, however, an operational police force. Interpol does not issue judgments, pursue criminal evidence, or pursue fugitives. *See* Sheptycki, *supra*.

    **a. Red Notices**

To facilitate communication among members' police forces, Interpol uses a system of color-coded notices. Starner Decl., Ex. D. At issue here is the red

notice. A red notice is, in effect, an international wanted persons' notice. *See* Mario Savino, *Global Administrative Law Meets Soft Powers: The Uncomfortable Case of Interpol Red Notices*, 43 N.Y.U. J. INT'L L. & POL. 263, 286 (2011). At the request of an international organization or an NCB, Interpol will draft a red notice and disseminate it "in order to seek the location of a wanted person and his/her detention, arrest or restriction of movement for the purpose of extradition, surrender or similar lawful action." Starner Decl., Ex. D.

A red notice must meet certain criteria for dissemination.[1] These criteria include offense, penalty, and data threshold requirements. *Id.* A red notice will not be published until the General Secretariat conducts a legal review for compliance. *Id.* Following the publication of a red notice, the subject of the red notice may request information about or deletion of the red notice via the Commission for Control of Interpol's Files ("CCF"), a quasi-judicial independent body. The subject may also submit a request for deletion of the red notice to the CCF. Compl. ¶ 53. There is no appeals process, but the subject may request a revision based on new information. *Id.* at ¶ 55.

   b. **The United States and Interpol**

---

[1] Access to red notices tends to be restricted to law enforcement. At present, there are approximately 62,000 valid red notices, 7,000 are public. *See* https://www.interpol.int/en/How-we-work/Notices/Red-Notices.

4

The United States joined Interpol in 1938. *See* 22 U.S.C.A. § 263a ("[t]he Attorney General is authorized to accept and maintain, on behalf of the United States, membership in the International Criminal Police Organization"). Congress subsequently amended the legislation to specify that the United States' member dues for Interpol were to be paid from the Department of Justice Budget. *Id.* In 1968 the United States established its NCB ("USNCB") in Washington DC. *See* Mot. to Dismiss at 3. The USNCB operates under the joint supervision of the Department of Justice and the Department of Homeland Security. *Id.*

On June 16, 1983, President Reagan designated Interpol an "International Organization" with limited immunity under the International Organization Immunities Act ("IOIA"), 22 U.S.C. § 288 via Executive Order No. 12,425. The IOIA articulates the process for designating an organization an international organization. Designation as an international organization under the IOIA entitles organizations to the same immunity granted to foreign sovereigns. *See* 12 U.S.C. § 288a(b) ("International organizations…shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign government"); *see also* Committee on Ways and Means, Granting Certain Privileges and Immunities to International Organizations and Employees H.R. Rep. No. 1203, 79th Cong., 1 Sess. 1 (1945), at 1 (the purpose

of the act is to provide international organizations and their officials and employees "privileges and immunities of a governmental nature"). Congress passed the IOIA on December 29, 1945 in response to the United States' increasing participation in international organizations. *See* Edward Chukwuemeke Okeke, *Jurisdictional Immunity of International Organizations in the United States in the Wake of the Supreme Court Decision in Jam v. IFC, 2020*, INTERGOVERNMENTAL ORG. IN-HOUSE COUNS. J. 1, 2 (2020). Since 1983, presidents have decreased the restrictions on Interpol's immunity under the Act, and in 2009 President Obama issued Executive Order 13,524, which removed all remaining limitations on Interpol's IOIA immunity.

## II.  PLAINTIFF'S CLAIM

As stated *supra*, Plaintiff is a United States citizen and a North Carolina citizen. Compl. ¶ 1. He previously worked in an Economic Free Zone in the United Arab Emirates (UAE) as an employee of Sheikh Faisal Bin Saqr Al Qassimi, a member of the UAE's royal family. *Id.* at ¶ 52. On July 31, 2016, Plaintiff landed at JFK Airport, New York. *Id.* at ¶ 46. As Plaintiff passed through U.S. Customs and Border Protection ("CBP"), several CBP Officers stopped Plaintiff and questioned him about his experiences in the UAE. *Id.* at ¶ 47. The CBP officers also cautioned Plaintiff against returning to the

UAE, warning him be "careful" because if he returned to the UAE he would be arrested and put in jail. *Id.*

Following this exchange, a CBP officer moved Plaintiff to a different room and took his passport. *Id.* at ¶ 48. Plaintiff overheard the CBP officers talking about Plaintiff over the phone. *Id.* After multiple phone calls about Plaintiff, the officer returned Plaintiff's passport, inspected Plaintiff's luggage, and allowed Plaintiff to leave the airport. Plaintiff returned to North Carolina the next day after missing his original connecting flight. *Id.* at ¶ 49.

The incident alerted Plaintiff to the possibility that Interpol had issued a red notice against him. *Id.* at ¶ 50. On October 26, 2016, Plaintiff submitted a written request to Interpol seeking all information it had about Plaintiff. *Id.* On November 24, 2016 Interpol responded by letter, confirming that Plaintiff's file did contain a red notice. Interpol informed Plaintiff that the red notice stated that the UAE NCB had requested the issuance of a red notice in connection with Plaintiff's February 8, 2015 conviction *in absentia* of embezzlement and abuse of power by the Criminal Court of Ras Al Kaimah. Compl. *Id.* at ¶ 51.

Plaintiff claims that before he was detained at JFK, he was unaware of the judgment against him because the UAE denied him notice of the charges,

barred him from accessing evidence or witnesses, and issued the judgment in secret and *in absentia*.[2] *Id.* at ¶ 52.

In response, Plaintiff submitted a written request to Interpol on December 15, 2016. In the response, Plaintiff lodged a complaint against Interpol, asked that Interpol delete the red notice and all related documents and files, and requested the opportunity to appear in front of Interpol by counsel with an expert witness. *Id.* at ¶ 53. On July 20, 2017, Interpol declined to delete the red notice and did not address Plaintiff's request for a hearing. Instead, it invited Plaintiff to reach out directly to the UAE to dispute the conviction. *Id.* at ¶ 54. On August 17, 2017 Plaintiff requested that Interpol revise its decision. On November 6, 2017, Interpol denied Plaintiff's request for revision. *Id.* at ¶ 56.

Plaintiff then brought this action on March 13, 2019. Plaintiff argues that by issuing and failing to delete the red notice, Interpol puts him "in serious and extreme fear for his physical safety." *Id.* at ¶ 57. According to Plaintiff, if he is returned to the UAE he faces "torture and disappearance in the [UAE]

---

[2] The underlying offense does not bear on the Court's decision. Accordingly, the Court describes the events only briefly. According to Plaintiff, while he was employed by Sheikh Faisal Bin Saqr Al Qassimi, Sheikh Faisal Bin Saqr Al Qassimi had a dispute with his brother, Sheikh Saud Bin Saqr Al Qassimi. Plaintiff's employer lost the dispute and, as a result, Plaintiff was terminated and allegedly convicted on spurious charges. Compl. at ¶ 52.

8

jails." *Id.* In addition, Plaintiff argues that the red notice and the risk of extradition trap him in the United States. This is a particular problem for Plaintiff because his family lives in Morocco and his field of expertise is Economic Free Zones. *Id.* Thus, the red notice bars him from maintaining his familial relationships and from gaining full employment. *Id.*

## DISCUSSION

Defendant moves to dismiss the complaint, *inter alia*, on the ground that the Court lacks subject matter jurisdiction over Plaintiff's claim. *See* Fed. R. Civ. P. 12(b)(1). *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.").

Defendant argues that it has been designated an international organization under the IOIA, and there are no exceptions to immunity. As a result, Defendant is immune from suit and the Court must dismiss Plaintiff's claim for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendant raises alternative arguments in its motion. *See* Mot. to Dismiss at 9-12, 20-23. The Court focuses only on whether it has subject matter jurisdiction, however, as when a court finds it lacks subject matter jurisdiction it need not consider alternative arguments.

*See, e.g., Zapolski v. Fed. Republic of Germany*, 425 F. App'x 5, 6 (2d Cir. 2011) (affirming dismissal of a claim because a district court must, at any time, dismiss an action where a court finds it lacks subject matter jurisdiction ); *Sampaio v. Inter-Am. Dev. Bank*, 806 F. Supp. 2d 238, 243 (D.D.C. 2011), *aff'd*, 468 F. App'x 10 (D.C. Cir. 2012) (dismissing claim without reaching defendant's other arguments because defendant was immune from suit under the IOIA).

## I. Legal Standard

"In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a court must assume that all of the factual allegations in the complaint are true." *Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998), at 5 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, (1974)). The plaintiff ultimately bears the burden to prove, by a preponderance of the evidence, the existence of subject matter jurisdiction. *Makarova,* 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996)).

A district court lacks subject matter jurisdiction and must dismiss a claim where defendant organization is immune from suit. *See Zuza v. Off. of High Representative,* 107 F. Supp. 3d 90, 93 (D.D.C. 2015), *aff'd sub nom. Zuza v. Off. of the High Representative*, 857 F.3d 935 (D.C. Cir. 2017) (collecting cases); *Brzak*

*v. United Nations*, 551 F. Supp. 2d 313, 317 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 107 (2d Cir. 2010); *Georges v. United Nations*, 834 F.3d 88, 98 (2d Cir. 2016).

The IOIA confers the "immunity from suit and every form of judicial process as is enjoyed by foreign governments," to international organizations "except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C.A. § 288a. An international organization under the Act is one "in which the United States participates pursuant to…the authority of any Act of Congress authorizing such participation or making an appropriation for such participation" and "which shall have been designated by the President through appropriate Executive order." 22 U.S.C.A. § 288.

**II.  Interpol is an international organization under the IOIA.**

For an organization to be considered an international organization under the IOIA it must satisfy three criteria. The organization must be (1) a public international organization, (2) in which the United States participates pursuant to an act or an authorization of Congress, and (3) designated as enjoying the privileges, exemptions, and immunities by the President via executive order. *See id.* Interpol satisfies all three criteria.[3]

---

[3] Also, the Second Circuit and the Supreme Court have accepted Interpol as an international organization without controversy in dicta. *See United States v. Ng Lap Seng*,

First, Interpol is a public international organization. According to Plaintiff, because the term, public international organization, is undefined, it is vague and subject to multiple interpretations. Defendant argues, and Plaintiff does not dispute, however, that Interpol meets the legal definition of an international organization.[4] Instead, Plaintiff claims that Interpol is not a <u>public</u> international organization.

Plaintiff argues without support that the term public refers to an organization's structure under the tax code of the country in which it is headquartered. Interpol fails to show that it is a <u>public</u> international organization under this definition because it does not provide documentation of its organization under French law. According to Plaintiff, this leaves open the possibility that Interpol is a private foundation rather than a public charity. (Strangely, Plaintiff does not point to French law, rather it suggests that French law might be similar to the Internal Revenue Code of

---

934 F.3d 110, 124 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 161, 207 L. Ed. 2d 1098 (2020) (listing Interpol as a public organization under the IOIA); *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 770 (2019) (referencing Interpol as a designated international organization by executive order).
[4] *See* Restatement (Third) of Foreign Relations Law § 221 (1987) (defining an international organization as "an inter-state organization, established by an international agreement governed by international law" with "headquarters, staff, and budget."); *see also* 44B Am. Jur. 2d International Law § 15 (defining an international organization as one created by international agreement with a membership consisting entirely or principally of states).

the United States). Which would mean that Interpol is not a public international organization. See Opp'n at 13-14.

This argument is wrong. "[U]nless otherwise defined, individual statutory words are assumed to carry their "ordinary, contemporary, common meaning." *Burgo v. Gen. Dynamics Corp.*, 122 F.3d 140, 143 (2d Cir. 1997) (quotation and citation omitted) *cert. denied*, 523 U.S. 1136, 118 S. Ct. 1839, 140 L.Ed.2d 1089 (1998). To determine a word's "ordinary, contemporary, common meaning" the Court may look to the word's dictionary definition. *See, e.g.*, *id.* Relevant here, public is defined as "of or provided by the state rather than an independent, commercial company." *Public*, Oxford Dictionaries (2021).

Interpol is a public organization because it is made up of member states and assists them in executing their police powers by facilitating mutual assistance and working to prevent and suppress ordinary law crimes. *See id.*, Ex. C. The police power is exclusively a state power. *See In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 92 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 ("exercise of the power of its police has long been understood…as peculiarly sovereign in nature.") (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 362 (1993)). Given

that Interpol exclusively assists member states with the execution of their police powers, Interpol is a <u>public</u> international organization.

Interpol satisfies the second criterion of § 288—that the United States participates in the international organization pursuant to an act or authorization of Congress. In 1938 Congress authorized the United States' participation in Interpol. *See* 22 U.S.C.A. § 263a ("[t]he Attorney General is authorized to accept and maintain, on behalf of the United States, membership in the International Criminal Police Organization"). Congress later amended the Act to specify that the United States' dues to Interpol would be paid from the Department of Justice's budget. *See supra*.

Interpol also satisfies the third criterion. It was designated by the President through appropriate Executive Order as being entitled to enjoy immunity under § 288a. On June 16, 1983, President Reagan designated Interpol an "International Organization" with limited immunity via Executive Order No. 12,425. *See* International Criminal Police Organizations, 48 FR 28069 (designating Interpol a public international organization entitled to all immunities conferred by the Act except those enumerated in the Executive Order). Subsequently, two presidents have issued executive orders that have reduced limitations on Interpol's immunity. In 1995, President Clinton issued Executive Order 12,971 removing some limitations

on Interpol's immunity. *See* Amendment to Executive Order No. 12425, 60 FR 48617. In 2009 President Obama issued Executive Order 13,524, which removed all remaining immunity limitations from Interpol under § 288a. *See* Amending Executive Order 12425 Designating Interpol as a Public International Organization Entitled To Enjoy Certain Privileges, Exemptions, and Immunities, 74 FR 67803. As a result, Interpol currently enjoys all immunity conferred by the IOIA.

Plaintiff does not dispute that Interpol was properly designated pursuant to § 288. Instead he takes issue with the constitutionality of § 288 itself. Plaintiff argues that Congress' delegation of the designation power to the executive violates the nondelegation doctrine. This argument fails. Delegations of congressional authority are upheld "so long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *United States v. Dhafir*, 461 F.3d 211, 215 (2d Cir. 2006) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). The Supreme Court has rarely found an impermissible delegation following the articulation of the "intelligible principle" in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). *Id.* Indeed, the Supreme Court has found no impermissible

delegations in the foreign affairs sphere, as the executive is afforded wide deference in the sphere. *Id.*

The President is the "sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320, 57 S. Ct. 216, 221, 81 L. Ed. 255 (1936). Accordingly, the President must be accorded "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Id.; Owens v. Republic of Sudan*, 531 F.3d 884, 891 (D.C. Cir. 2008) ("[a] statute that delegates factfinding decisions to the President which rely on his foreign relations powers is less susceptible to attack on nondelegation grounds than one delegating a power over which the President has less or no inherent Constitutional authority.") The designation of organizations made up of international actors pursuing international public activities unquestionably falls within the sphere of foreign relations. *See* LOUIS HENKIN, FOREIGN AFFAIRS AND THE UNITED STATES CONSTITUTION 31-50 (2d ed. 1996) (under his foreign affairs power, the President may, *inter alia*, pursue new foreign policies and diplomatic relations). As a result, § 288 does not violate the nondelegation doctrine. *See Zuza*, 107 F. Supp. 3d at 97 ("delegation [under § 288] does not run afoul of the separation of powers

doctrine"); *Weidner v. Int'l Telecommunications Satellite Org.*, 392 A.2d 508, 510 (D.D.C. 1978) (finding President Ford's designation of the International Telecommunications Satellite Organization as an international organization "well within [his] authority, and [that] the designation was not Ultra vires.")

### III. No exceptions to immunity apply.

International organizations are not absolutely immune from suit. *See Jam*, 139 S. Ct. at 772. Under the IOIA, "[international] organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C.A. § 288a(b). The immunity provided by § 288a(b) is also not unlimited.. Designated international organizations "enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." *Id.* The Supreme Court held that § 288a(b) affords international organizations the restrictive immunity that foreign governments enjoy today, as codified by the Foreign Sovereign Immunities Act ("FSIA"). *See Jam*, 139 S. Ct. at 768.[5] FSIA "gives foreign sovereign governments presumptive immunity from suit, subject to several statutory exceptions." *Id.* Accordingly, for a court to exercise jurisdiction over a claim

---

[5] Prior to the Supreme Court's decision in *Jams* there had been intense disagreement about whether 288a(b) entitled international organizations to the virtually absolute immunity afforded to foreign nations in 1945 when the Act was passed, or to the more restrictive immunity enjoyed by foreign nations today.

against an international organization, the organization must have waived its immunity or fall within one of the FSIA's exceptions. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 47 (2d Cir. 2010).

Plaintiff argues that Interpol has waived its immunity under § 288a(b) or § 28 U.S.C.A. § 1605(a)(1).[6] Plaintiff writes Defendant waived its immunity through art. 24(1) of its Headquarter Agreement with France, which requires that disputes must be heard at the Permanent Court of Arbitration at the Hague. This argument is irrelevant. As Plaintiff concedes, French Decree 2016-326 abrogates art. 24(1). French Decree 2016-326 states that the "arbitration channel provided for in paragraph 1 of Article 24…does not apply…to disputes regarding the processing of data in Interpol's Information System—such as Interpol notices." The decree was promulgated on March 17, 2016, before any of the events at issue transpired. Thus, even if the Headquarter Agreement had waived Interpol's immunity at one point (which the Court does not find), by the time Plaintiff was detained at JFK it did not.

---

[6] FSIA provides for no immunity from jurisdiction where "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C.A. § 1605.

Finally, Plaintiff argues that accepting French Decree 2016-326 and finding Interpol immune from suit leads to an unacceptable result—i.e. it leaves "Interpol above the law." Opp'n. at 19 (emphasis in the original). This argument fails as it does little besides question why immunity exists. "[L]egislatively and judicially crafted immunities of one sort or another have existed since well before the framing of the Constitution, have been extended and modified over time, and are firmly embedded in American law," however. *Brzak v. United Nations*, 597 F.3d 107, 114 (2d Cir. 2010). If the Court were to accept Plaintiff's argument, "judicial immunity, prosecutorial immunity, and legislative immunity, for example, could not exist." *Id.*; *see also Georges v. United Nations*, 834 F.3d 88, 98 (2d Cir. 2016).

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: May 13, 2021
Brooklyn NY

signed Sterling Johnson, Jr., U.S.D.J.
Sterling Johnson, Jr., U.S.D.J.